**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CR-00567-HEA-NCC |
| | ) | |
| MARSHALL LAMPKIN, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM, REPORT AND RECOMMENDATION</u>**
**<u>OF UNITED STATES MAGISTRATE JUDGE</u>**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Defendant Marshall Lampkin ("Defendant" or "Lampkin") is charged with ten counts of mail fraud.  He has filed a motion to dismiss the indictment and to suppress evidence.  Upon review of the motions and the Government's responses, the undersigned recommends that Defendant's motions be denied.

Based on the evidence and the arguments by the parties, as well as a review of the transcripts of the hearings in this matter, the undersigned makes the following findings of fact and conclusions of law.

**BACKGROUND**

**A.     Procedural History**

At his initial appearance on October 20, 2023, the Court appointed the Federal Public Defender for the Eastern District of Missouri to represent Lampkin in all further proceedings. On January 20, 2024, Lampkin retained private counsel, Mark Byrne, and the Federal Public Defendant was granted leave to withdraw.  After a motion filed by Lampkin, the Court appointed

Mr. Byrne to represent Defendant.[1]  [ECF No. 47].  On July 19, 2024, this matter came before the undersigned for a status hearing at which Defendant requested leave to represent himself. Following an inquiry of Defendant, and for the reasons stated on the record, the Court granted Defendant's motion to represent himself and ordered that Mr. Byrne serve as standby counsel. [ECF No. 59].

On August 8, 2024, Defendant filed a *pro se* motion to suppress evidence including a request for hearing under *Franks v. Delaware*[2] connected to a search warrant and seizure of evidence from Defendant's two rented storage units [ECF No. 61].  On August 23, 2024, Defendant filed a *pro se* motion to dismiss the indictment [ECF No. 63].  The Government responded to both motions [ECF Nos. 62 & 64].

On November 21, 2024, the undersigned began an evidentiary hearing with Lampkin *pro se* and Mr. Byrne present as standby counsel.  The Government was represented by AUSA Justin Ladendorf.  The Court heard from Defendant on his motion to suppress and his motion to dismiss, and the undersigned made a preliminary determination that he had not made a substantial preliminary showing to merit a *Franks* hearing.  During the hearing,[3] Lampkin requested that the Court re-appoint Mr. Byrne to represent him for all further proceedings.  The Court granted defendant Lampkin's motion.  Mr. Byrne made an oral motion for additional time to review Defendant's pending motions and to supplement or amend the motions, which the Court granted in the interest of justice.

---

[1] Mr. Byrne was appointed as a non-member of the Court's Criminal Justice Act panel under 18 U.S.C. § 3006(A).

[2] 438 U.S. 154 (1978).

[3] Defendant paused repeatedly and at length during his oral argument and eventually stopped talking, which prompted the undersigned to inquire of him whether he would like to continue *pro se* or have Mr. Byrne represent him.

On December 16, 2024, Lampkin filed supplemental pretrial motions *pro se*.  [ECF No. 77].  On December 12, 2024, Mr. Byrne filed a second motion to withdraw as counsel citing to recent communications with defendant who expressed his wish to represent himself and to conduct again his own oral arguments on his pending motions.  [ECF No. 76].  Mr. Byrne also noted that Defendant disagreed with his legal advice.  On December 16, 2024, Defendant filed a second motion to dismiss [ECF No. 77] to which the Government responded on December 23, 2024 [ECF No. 78].  Defendant replied to the Government's response on January 10, 2025 [ECF No. 79].  The undersigned determined a supplemental evidentiary hearing was necessary because the first hearing ended without completion and Mr. Byrne moved to continue.  On February 6, 2025, the Government filed a motion for clarification regarding the continued hearing and, in the alternative, to continue the evidentiary hearing.  [ECF No. 81].

On March 12, 2025, the Court continued the evidentiary hearing and granted Mr. Byrne's renewed request to withdraw on the grounds that there were irreconcilable differences between client and counsel.  The Court reappointed Mr. Byrne as standby counsel.  Defendant proceeded *pro se*.  The parties made oral arguments and offered no witnesses.  The Government submitted one exhibit, which was the search warrant package for two rented storage units associated with Lampkin.

### B.    Allegations in the Indictment

 The allegations are that Lampkin used a Kohl's Corporation online shopping account associated with an email address lampkin***@ gmail.com to conduct a mail fraud scheme against Kohl's, a national retailer with 1,100 stores in 49 states.  Kohl's offered its customers various rewards for shopping at Kohl's, including a rewards program called Kohl's Cash.  A Kohl's customer could earn Kohl's Cash subject to certain exclusions during certain promotional

windows called "earn periods," such that a Kohl's customer was able to earn $10 Kohl's Cash for every $50 of merchandise that the customer purchased.  Kohl's Cash is assigned a unique Kohl's Cash number, and the customer could spend Kohl's Cash either in-store or online prior to expiration of the Kohl's Cash.  Kohl's arranged for online purchases to be shipped by the United Parcel Service ("UPS").  Kohl's provided customers with a full refund in the form of new Kohl's Cash for items returned that were purchased with Kohl's Cash.

Beginning in October 2021 and continuing through at least March 2022, within the Eastern District of Missouri and elsewhere, Lampkin, with the intent to defraud, devised and intended to devise a scheme and artifice to defraud Kohl's and to obtain property from Kohl's by means of materially false and fraudulent pretenses, representations and promises by concealment of material facts.

On numerous occasions, Defendant's scheme involved an in-store purchase of merchandise from Kohl's using Kohl's Cash and then, before the Kohl's system could account for the in-store purchase and remove the Kohl's Cash from Defendant's online shopping account, he immediately completed an online order for merchandise using the same Kohl's Cash that he knew he had already spent in-store.  After both transactions were completed, Defendant returned the merchandise purchased in-store and, despite knowing he had "double-spent" the Kohl's Cash used for the in-store purchase, he obtained a refund in the form of Kohl's Cash for the full amount of the in-store purchase. The repeated scheme resulted in Defendant making at least 400 online transactions related to $200,000 worth of Kohl's merchandise from Kohl's without providing valid Kohl's Cash or legal tender for the merchandise.

As to the manner and means of the scheme, Counts One through Ten of the indictment allege mail fraud in violation of 18 U.S.C. § 1341.  The indictment further alleges three sample

4

transactions of the scheme.  Transaction 1 occurred on or about November 12, 2021, and is described in Paragraphs 14 through 18 of the indictment as:

> 14. On or about November 12, 2021, at or about 7:40 p.m., Defendant Lampkin made an in-store purchase of merchandise from a Kohl's store in Mt. Prospect, Illinois using Kohl's Cash (assigned the unique Kohl's Cash number 263380489074820).

> 15. On or about November 12, 2021, at or about 7:43 p.m., before Kohl's system could account for the above-referenced in-store purchase and remove the Kohl's Cash (assigned the unique Kohl's Cash number 263380489074820) from Defendant Lampkin's Kohl's online shopping account, Defendant Lampkin completed an online order for merchandise using the same Kohl's Cash and thereby represented that the Kohl's Cash was valid when, in truth and in fact, as Defendant Lampkin well knew and concealed, the Kohl's Cash was invalid because he had already spent it in-store.

> 16. After completing the above-referenced transactions, on or about November 13, 2021, Defendant Lampkin returned the merchandise purchased in-store to a Kohl's store in North Riverside, Illinois and, despite knowing and concealing that he had double-spent the Kohl's Cash used for the in-store purchase, he obtained a refund in the form of Kohl's Cash for the full amount of the in-store purchase.

> 17. As a result of the foregoing, Defendant Lampkin obtained the merchandise ordered online without providing valid Kohl's Cash or legal tender for the merchandise.

> 18. Defendant Lampkin caused Kohl's to have the merchandise that he ordered online shipped by UPS to a storage facility located at 4175 Chippewa Street, St. Louis, Missouri 63116.

[ECF No. 1 at 3-4].

Similarly, Transactions 2 and 3 are described in the indictment and describe that Defendant made an in-store Kohl's purchase of merchandise in Rockford, Illinois and Aurora, Colorado on specific dates and at specific times using Kohl's Cash, which was assigned a unique number.  Defendant later returned the merchandise purchased in-store to a Kohl's store, despite knowing and concealing he had double-spent the Kohl's Cash used for the in-store purchase.  He obtained a refund in the form of Kohl's Cash for the full amount of the in-store purchase.

Defendant caused Kohl's to have the merchandise he ordered online to be shipped by UPS to residences in Saint Louis.

The mailings made in violation of Title 18, United States Code, Section 1341 began no later than October 2021 and continued through at least on or about March 2022, within the Eastern District of Missouri and elsewhere.  The indictment alleges that Defendant having devised and intended to devise the above-described scheme and artifice to defraud, and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, for the purpose of executing the above-described scheme, and with the intent to defraud, knowingly caused to be used by a commercial interstate carrier to deliver the following matter and thing, to wit:

| Count | Transaction | Address |
|---|---|---|
| 1 | Kohl's merchandise ordered online on or about November 12, 2021 | 4175 Chippewa Street, St. Louis, Missouri 63116 |
| 2 | Kohl's merchandise ordered online on or about November 13, 2021 | 4175 Chippewa Street, St. Louis, Missouri 63116 |
| 3 | Kohl's merchandise ordered online on or about December 12, 2021 | 4175 Chippewa Street, St. Louis, Missouri 63116 |
| 4 | Kohl's merchandise ordered online on or about December 13, 2021 | 4175 Chippewa Street, St. Louis, Missouri 63116 |
| 5 | Kohl's merchandise ordered online on or about January 7, 2022 | 3143A Mount Pleasant Street, St. Louis, Missouri 63111 |
| 6 | Kohl's merchandise ordered online on or about January 9, 2022 | 3143A Mount Pleasant Street, St. Louis, Missouri 63111 |
| 7 | Kohl's merchandise ordered online on or about February 15, 2022 | 3143A Mount Pleasant Street, St. Louis, Missouri 63111 |
| 8 | Kohl's merchandise ordered online on or about February 15, 2022 | 3143A Mount Pleasant Street, St. Louis, Missouri 63111 |
| 9 | Kohl's merchandise ordered online on or about March 13, 2022 | 3415 Osage Street, St. Louis, Missouri 63118 |
| 10 | Kohl's merchandise ordered online on or about March 13, 2022 | 3415 Osage Street, St. Louis, Missouri 63118 |

**C.      Search Warrant for Extra Space Storage Unit 1409 and Unit 1426 at 4175 Chippewa Street, St. Louis, Missouri 63116**

*1.     The Affidavit*

On October 4, 2023, a Magistrate Judge in this district signed a search warrant[4] ordering Special Agent Mudassar Malik with the United States Secret Service in Saint Louis to search two storage units (Units #1409 and #1426).  The probable cause for the search warrant included background about the national retailer Kohl's, the Kohl's Cash programs ("Green Kohl's Cash" and "Blue Kohl's Cash"), and the alleged fraud by Lampkin.  SA Malik has experience investigating fraud crimes.

On August 1, 2023, Saint Louis County Detective Jon Holman contacted SA Malik to discuss a source of information, Nicholes Blackwell, who reported a potential wire-fraud scheme by Lampkin.  Blackwell was in the custody of the Missouri Department of Corrections ("MDOC") for unrelated criminal activity when he spoke with investigators.

On August 3, 2023, SA Malik and Det. Holman conducted the first of two in-person interviews with Blackwell at the Eastern Reception, Diagnostic and Correctional Center after explaining that Blackwell was not obligated to give an interview, and he had a right to terminate the interview at any time.  Blackwell agreed to proceed.  Blackwell told the investigators about defendant Lampkin's nationwide scheme to defraud Kohl's by spending Blue Kohl's Cash in-store, which did not immediately debit from his online Kohl's account, and which ultimately, resulted in Lampkin obtaining merchandise without providing valid Kohl's Cash or legal tender for the items.

---

[4] The content of the search warrant speaks for itself and is incorporated here by reference.  The warrant is the best evidence of its content.

The scheme hinged on a short electronic lag in the Kohl's Cash customer account system. Lampkin discovered that he could add merchandise to his online shopping cart connected to his Blue Kohl's Cash account, awaiting a final purchase, and still use his Blue Kohl's Cash in-store to purchase the same type of merchandise that was saved in his online shopping cart. After the in-store purchase, Lampkin immediately completed an online purchase of matching merchandise saved in his online shopping cart with the Blue Kohl's Cash he had redeemed in-store. After completion of both transactions, and knowing that a mail delivery was forthcoming, Lampkin would return the merchandise purchased in-store for a complete refund at a different Kohl's store to avoid detection. He then kept the merchandise purchased online for "free" after it was delivered to him in the mail.

Blackwell reported during his initial interview that Lampkin stored most or all the Kohl's merchandise he obtained via online transactions in units at EZ Storage on Chippewa Street in Saint Louis. Blackwell traveled with Lampkin to the storage units in September 2022 and saw the merchandise. Lampkin told Blackwell that he planned to accumulate $1,000,000 of merchandise and sell the entirety to an "end-buyer" in New York as his "retirement fund." Blackwell stated that he traveled to New York with Lampkin and met an unnamed person who said he would buy the merchandise from Lampkin. Blackwell later reported that the merchandise was stored unopened in its original packaging.

The search warrant affidavit states that Blackwell explained that he traveled with Lampkin on multiple occasions to various states and personally observed and assisted Lampkin in the execution of the scheme by completing an in-store return of merchandise or completing the fraudulent online purchase of merchandise. Blackwell also reported that he accompanied Lampkin on multiple occasions and personally observed Lampkin unsuccessfully attempt to

execute the scheme.  The affidavit explained that Lampkin's eventual lack of success was because Kohl's deactivated Lampkin's ability to use Blue Kohl's Cash via his online shopping account.

On August 4, 2023, SA Malik interviewed a Kohl's investigator, Michael Kampschroer, about Lampkin, who reported in March 2022, Kohl's discovered Lampkin's scheme.  The retailer then disabled Lampkin's ability to make purchases using Blue Kohl's Cash via his online shopping account and directed store personnel to be alert should Lampkin attempt to further defraud the retailer.  Kohl's provided documentation of Lampkin's purchase history to SA Malik, which supported the retailer's basis for the Kohl's investigation and corroborated some of Blackwell's statements.  The search warrant affidavit included screenshots of the retailer's records of Lampkin's purchase history between October 2021 and March 2022, including at stores in 15 states, with Kohl's Cash values, and the associated billing email.  The purchase history showed that 55 of the 453 online orders by Lampkin shipped to EZ Storage located at 4175 Chippewa Street in Saint Louis between October and December 2021.  Another 230 online orders by Lampkin were shipped to four addresses associated with Lampkin or his relatives in Saint Louis or to his mother's address in Collinsville, Illinois.  SA Malik explained that he connected Lampkin to the affiliated address information from a review of open-source databases.

Kampschroer also gave SA Malik still images (referred to as photographs in the affidavit) of Lampkin with Blackwell in two Illinois stores in May 2022, and inside an Indiana store, attempting to execute the scheme to no avail because Kohl's had deactivated Lampkin's Blue Kohl's Cash by that time.

The Kohl's investigator also provided images from Lampkin's Facebook account described as "ecommerce links" that appear to show merchandise in original packaging stored

inside and outside a storage unit.  Blackwell confirmed that those images matched Lampkin's Facebook account, and SA Malik believed that the photographs of Lampkin's Facebook account provided to him by Kohl's further corroborated Blackwell's statements.

Kohl's believed that Lampkin continued to attempt his scheme in March 2022 by using Kohl's online shopping accounts associated with other names and email addresses or by the manual use of Kohl's Blue Cash numbers or physical certificates.  The Kohl's investigation continued.

On August 2, 2023, Kohl's was aware that Lampkin and a woman identified as his mother were together in a Kohl's store in Joplin, Missouri.  The retailer's investigator provided images of Defendant's mother, who returned merchandise valued at approximately $1,800.  She was issued approximately $1,800 in physical certificates of Blue Kohl's Cash.  Thereafter, Lampkin attempted to purchase approximately $1,800 in merchandise at the store using the certificates issued for the returned merchandise.  Store personnel voided the Blue Kohl's Cash. Defendant and his mother complained that the returned merchandise was not re-released to them after the Blue Kohl's Cash was voided.  Ultimately, Defendant, and his mother left the store with the merchandise Defendant's mother had returned after police arrived at the store to escort them out.

On August 31, 2023, SA Malik conducted a second interview of Blackwell, who reported that he was present with Lampkin in Kohl's stores and heard employees ask Lampkin to leave after they informed Lampkin that the retailer's fraud department was investigating Lampkin. Blackwell observed Kohl's personnel give Lampkin a contact card for Kohl's fraud department and he later heard Lampkin's telephone conversations with Kohl's fraud department personnel. SA Malik believed that the Kohl's investigation corroborated Blackwell's statements about his

personal observations of Lampkin's unsuccessful attempt to execute the scheme.  Blackwell was also aware that Lampkin occasionally sold merchandise stored in the units to pawnshops for money, but he also believed that Lampkin had an emotional attachment to the merchandise, and he would repurchase the items from the pawnshops and return the items to the storage units. Lampkin also arranged for some merchandise he purchased online to be shipped directly to others across the country who pre-purchased items from him.

On August 31, 2023, SA Malik interviewed a front desk employee of Extra Space Storage (name recently changed from EZ Storage), at 4175 Chippewa Street in Saint Louis.  The facility's records showed that Defendant rented at least two storage units in his name beginning May 4, 2022.  On July 28, 2023, he upgraded to two larger storage units with a declared value of $50,000 for the property stored in each unit.  Defendant listed his mother as an alternate contact as part of the new lease agreements.  The storage facility's activity log of his visits showed that Defendant was present on 55 different days between August 1, 2022, and July 27, 2023. Between July 28, 2023, and August 31, 2023, Defendant accessed the two units on sixteen different occasions.  SA Malik believed that Defendant was moving items from his prior units into the larger units based on his activity log on August 2, 2023.

SA Malik believed that Defendant's visits to the storage units as recently as August 21 and 29, 2023, suggested the merchandise was likely still being stored there as of October 4, 2023.

## 2.    *The Error in the Affidavit*

Paragraph 22 of the 38-paragraph affidavit states Blackwell said "that, among other occasions, [Blackwell] personally accompanied Lampkin to the storage units in September 2022 (shortly before [Blackwell's] arrest) and observed merchandise from the online orders in the

storage units." [5]  *Id.*  Blackwell did make this statement to investigators; however, the affidavit did not discuss that Lampkin was arrested on an unrelated matter in Saint Louis on August 17, 2022, and he remained in state custody without a bond until November 18, 2022.

It would not be possible for Lampkin and Blackwell to have visited the storage units together in September 2022.

### 3.    *The Omission in the Affidavit*

Paragraph 19 of the affidavit states that Blackwell "had travelled with Lampkin on multiple occasions to Kohl's stores in various states and, on these occasions, he personally observed Lampkin execute the scheme . . . and/or personally assisted Lampkin with executing the scheme . . . either by completing the in-store return of merchandise or by completing the fraudulent online purchase of merchandise." *Id.*  The affidavit omits that Blackwell was in law enforcement custody from May 15, 2021, through April 15, 2022, first in Tarrant County, Texas and then in the Missouri Department of Corrections.

It would not have been possible for Blackwell to assist Lampkin in directly carrying out the scheme during the dates alleged in the indictment between October 2021 and March 2022.

### DISCUSSION

### Defendant's Motions to Dismiss [ECF Nos. 63 and 77]

Defendant moves to dismiss the indictment on the grounds that the ten counts in the indictment fail to establish an essential element of a mail fraud scheme, and, therefore, the court lacks jurisdiction under Rule 12(b)(2), Fed. R. Crim. P.  The Government counters that Lampkin's scheme was complete when he obtained the object of his scheme, which was the

---

[5] Additionally, Defendant claims there is misleading information in the affidavit, which is addressed below.

merchandise ordered online from Kohl's and delivered to him and others in the mail.

Defendant's motion does not have merit, and it should be denied.

### A.     Legal Standards

*Sufficiency of an Indictment*

Fed. R. Crim. P. 7(c)(1) has a two-fold requirement that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." The primary purpose of the rule is to give fair notice to a defendant. *See Russell v. United States*, 369 U.S. 749, 763-64 (1962) (noting that two of the protections an indictment is intended to guarantee are whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction); *see also United States v. Hayes*, 574 F.3d 460, 472 (8th Cir. 2009) (following longstanding precedent in reasoning an indictment is sufficient if "it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution.").  The Court in *Hayes* explained that these are not strenuous requirements for the government, and factual allegations need not be proven at this stage of the proceedings since an indictment will "ordinarily be held sufficient unless it is so defective that it cannot be said, by *any reasonable construction*, to charge the offense for which the defendant was convicted."  *Hayes*, 574 F.3d at 472 (emphasis added).  As such "[a]n indictment should not be read in a hyper technical fashion…."  *United States v. O'Hagan*, 139 F.3d 641, 651 (8th Cir. 1998).

The test for sufficiency of an indictment is not dependent on whether the government can establish its evidence for trial. *See United States v. Sampson*, 371 U.S. 75, 78-79 (1962). Given that the primary purpose of the rule is to give fair notice to the defendant, "[a]n indictment is normally sufficient if its language tracks the statutory language." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). However, "[i]f an essential element of the charge has been omitted from the indictment, the omission is not cured by the bare citation of the charging statute." *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1998); *see also O'Hagan*, 139 F.3d at 651 (quoting *Zangger*). A slightly higher degree of additional detail is required for charges involving bank, mail, or wire fraud statutes, and the indictment must "specify facts...with such reasonable particularity as will apprise the defendant, with reasonable certainty, of the nature of the accusation and as will enable the court to say that the facts stated are sufficient in law to support a conviction." *United States v. Steffen*, 687 F.3d 1104, 1111, 1113 (8th Cir. 2012). The question turns on the adequacy of facts to state the elements of that offense. *See United States v. Flute*, 929 F.3d 584, 587 (8th Cir. 2019); *United States v. Hansmeier*, 988 F.3d 428, 436 (8th Cir. 2021), *cert. denied*, No. 21-5128, 2021 WL 4508790 (U.S. Oct. 4, 2021).

The ruling in *Zangger* recognizes the second requirement of Rule 7(c)(1) that a "statement of essential facts" must also be included in an indictment. "They are separate requirements and not a restatement of one another." *United States v. Camp*, 541 F.2d 737, 740 (8th Cir. 1976). *See Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (The language of the statute "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."). For example, a *mens rea* element is required. *United States v. Denmon*, 483 F.2d 1093, 1095-97 (8th Cir. 1973). Again, the purpose of this requirement is to fairly inform the

defendant so that he or she can prepare for a defense, but the government need not sufficiently prove the elements of the offense on the face of the indictment. *Id.* Simplicity in procedure is a goal of the Federal Rules of Procedure. *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) (deciding that failure to list overt acts in an indictment is not required and not fatal under Rule 7 in an illegal reentry case). Accordingly, the government has generally done enough if the indictment sets forth the essential facts "with reasonable particularity of time, place, and circumstances." *United States v. Hess*, 124 U.S. 483, 487-88 (1888).

*Prohibited Uses of the Mail*

The mail fraud statute prohibits use of the interstate mail to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The government must prove: "(1) there was a deliberate plan of action or course of conduct to hide or misrepresent information; (2) the hidden or misrepresented information was material; and (3) the purpose was to get someone else to act on it." *United States v. Luna*, 968 F.3d 922, 926 (8th Cir. 2020) ("A scheme is a 'deliberate plan of action' or 'course of conduct.'"). "To defraud someone requires material, affirmative misrepresentations or active concealment of material information for the purpose of inducing action." *Id.* (quoting *Steffen*, 687 F.3d at 1111, 1115).

**B.    The Allegations**

Defendant argues in part that "an indictment under the mail fraud statute which shows on its face that the mailing was after the perpetration or accomplishment of the fraud would confer no jurisdiction upon the Federal Court to try such an offense… and the devising of the scheme to defraud must be alleged as well of the use of the mails…." [ECF No. 63 at 3]. Upon close

review, Lampkin appears to concede that Transaction 1, as described in Paragraphs 14 and 15, sufficiently alleges that a fraudulent transaction occurred:

> 14. On or about November 12, 2021, at or about 7:40 p.m., Defendant Lampkin made an in-store purchase of merchandise from a Kohl's store in Mt. Prospect, Illinois using Kohl's Cash (assigned the unique Kohl's Cash number 263880489074820).

> 15. On or about November 12, 2021, at or about 7:43 p.m., before Kohl's system could account for the above-referenced in-store purchase and remove the Kohl's Cash (assigned the unique Kohl's Cash number 263880489074820) from Defendant Lampkin's Kohl's online shopping account, Defendant Lampkin completed an online order for merchandise using the same Kohl's Cash and thereby represented that the Kohl's Cash was valid when, in truth and in fact, as Defendant Lampkin well knew and concealed, the Kohl's Cash was invalid because he had already spent it in-store.

> 16. After completing the above-referenced transactions, on or about November 13, 2021, Defendant Lampkin returned the merchandise purchased in-store to a Kohl's store in North Riverside, Illinois and, despite knowing and concealing that he had double-spent the Kohl's Cash used for the in-store purchase, he obtained a refund in the form of Kohl's Cash for the full amount of the in-store purchase.

> 17. As a result of the foregoing, Defendant Lampkin obtained the merchandise ordered online without providing valid Kohl's Cash or legal tender for the merchandise.

> 18. Defendant Lampkin caused Kohl's to have the merchandise that he ordered online shipped by UPS to a storage facility located at 4175 Chippewa Street, St. Louis, Missouri 63116.

*Id.* As to Paragraph 16, Lampkin further concedes that the indictment states that the fraud reached its fruition. The crux of his claim is that Paragraph 18 fails to support any charge because the mailing occurred after the fraud reached its fruition and the "mails were used for a purpose that is not in the execution or attempted execution of such so-called fraudulent scheme." [ECF No. 63 at 3].

Defendant's second motion to dismiss does not depart significantly from his first motion. "In this case, the scheme was accomplished [when] Kohls honored the Kohls cash card.

16

Mailings that occur after the fruition of a scheme [sic] generally not considered to be in furtherance of the scheme." [ECF No. 77]. Lampkin lists in summary fashion cases from a variety of jurisdictions, and he states in a conclusory manner that his case is unlike the others because those defendants "mailed letters to suppliers in order to receive merchandise." *Id.* at 5.

The Government counters that Lampkin misidentifies the applicable Rule 12 standard because "defects in an indictment do not deprive a court of its power to adjudicate a case." *United States v. Cotton*, 535 U.S. 625, 630 (2002). The undersigned agrees. Lampkin's claim is better identified as a motion for failure to state an offense under Rule 12(b)(3)(B)(v), and his claim turns on whether the indictment is legally and facially sufficient as to the fourth element of the offense. "The question of whether the facts alleged in an indictment adequately state an offense therefore turns on the elements of that offense." *Hansmeier*, 988 F.3d at 436. The Government argues that the indictment is sufficient as to the mailing element and cites to *United States v. Ruzicka*, 988 F.3d 997 (8th Cir. 2021). In *Ruzicka*, the defendant caused his employer to make check payments by mail to his own consulting firm that did no actual work for his employer:

> Ruzicka is correct that mail fraud requires the use of the mails "in furtherance of some essential step in the scheme" to defraud. *See United States v. Bennett*, 765 F.3d 887, 893 (8th Cir. 2014). A step is essential to a scheme to defraud if "the long-term success of the fraud ... turn[s] on" whether the step is completed. *Schmuck v. United States*, 489 U.S. 705, 714, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). For example, "post-fraud accounting among the potential victims" generally is not an essential step in a scheme to defraud because perpetrators of fraud generally are "indifferent to the fact of who b[ears] the loss." *Id*. In contrast, the perpetrators' receipt of the proceeds of the fraud is an essential step in the scheme to defraud because the success of the fraud depends on it. *See Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944) (treating a fraud as complete when "the persons intended to receive the money had received it irrevocably"); *United States v. Fiorito*, 640 F.3d 338, 349 (8th Cir. 2011) (holding that mailings that assisted the perpetrator in cashing out the full profit of the scheme furthered an essential step in the scheme).

*Id.* at 1010.

Upon review, the indictment in this case sufficiently alleges that Lampkin's Kohl's online purchases without proper payment and subsequent shipments of merchandise via the mail furthered the fraud scheme. Lampkin's argument that the fraud was completed at the point of purchase is not well founded. Lampkin caused Kohl's to mail merchandise to him upon his online orders. Lampkin's success depended on *receipt* of the specific merchandise (and the receipt of merchandise by his customers or others) without proper payment, which was essential to the completion of the scheme. Otherwise, he and others who aided him would simply have been making purchases with redeemed Kohl's Cash and returning the same items, which would leave the parties to the transaction whole and would not be a fraud crime. Consistent with the holding in *Fiorito*, *supra*, by the Eighth Circuit Court of Appeals, it is hard to see what would be gained without receipt of the mailed merchandise, and the mailings prompted by him minutes after his in-store purchases. This also appears to have been a crucial step to ensure the scheme's success because of the lag in the Kohl's Cash online tracking system. Thus, the shipments via the mail also advantaged Lampkin who was then free to travel to stores in multiple states to further the scheme without the need to be present when the online merchandise arrived at the addresses he designated.

To the extent that Lampkin further suggests that it would be judicial overreach to read the mail fraud statute to include his conduct, this argument in misplaced. "When the meaning of a statute [is] at issue, the judicial role is to 'interpret the act of Congress, in order to ascertain the rights of the parties.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (citations omitted) (explaining the Court's role regarding statutory interpretation of ambiguous laws). "Our role is to interpret and apply statutes as written, ...." *Doe v. Dep't of Veterans Affs. of U.S.*,

519 F.3d 456, 461 (8th Cir. 2008).  Finally, to the extent that Lampkin is challenging the sufficiency of the Government's evidence by way of his motions to dismiss, such a challenge should be denied.  "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3rd Cir. 2000) (holding that Fed. R. Crim. P. 12(b)(2) authorizes dismissal of an indictment on the grounds that its allegations are not sufficient to charge an offense but not on the grounds that the evidence is not sufficient to prove the charges).  "Where an indictment quotes the language of the statute and includes the date, place and nature of the illegal activity, it need not go further and allege in detail the factual proof that will be relied upon to support the charges." *United States v. Doe*, 572 F.3d 1162, 1173-1174 (10th Cir. 2009) (quotation omitted).

In quoting the Third Circuit Court of Appeals in *DeLaurentis*, the Eighth Circuit opined:

> In civil cases, of course, the summary judgment procedures contemplated by Federal Rule of Civil Procedure 56 may be utilized to test, pretrial, the sufficiency of the evidence to establish triable issues of fact; but there is no corollary in criminal cases.  The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29…. [W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be.

*United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (alterations in original).  Accordingly, the Court's focus is necessarily on the Government's pleadings in the indictment.  *Hansmeier*, 988 F.3d at 438.  Defendant is free at trial to "dispute the facts, offer alternative explanations for his conduct, or provide context to any of the actions alleged." *Id.*  These points should be denied.[6]

---

[6] The indictment in this case does also as it must (1) track the language of the statute, (2) identify the federal criminal law violation, (3) allege each of the essential elements of the crime of mail fraud, (4) state the nature of each count and the fraudulent scheme, (5) specify the specific mailings, as well as the approximate time period during which the crimes took place, and (6)

**Defendant's Motion to Suppress [ECF No. 61]**

The Government submitted the search warrant package without objection and has asked the Court to consider the four corners of the documents to find sufficient probable cause.  The undersigned has also considered the parties' arguments about the factual errors in the search warrant and the Government's concessions that the Court should strike the passages limited to Blackwell's challenged statements.  After careful review, Lampkin's motion should be denied.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Courts should apply the exclusionary rule to evidence obtained by the government in violation of the Fourth Amendment such that the evidence may not be introduced at trial to prove a defendant's guilt.  The U.S. Supreme Court has defined probable cause to search as "a fair probability that the contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched.  *Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294 (1967).  *See also* Fed. R. Crim. P. 41.  Stated another way:

> If an affidavit in support of a Search Warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' probable cause to issue the warrant has been established."

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)).  Probable cause requires a "fair probability that contraband or

_____

state the locations from which the scheme was allegedly operated.  *See Hayes*, 574 F.3d at 472-73.

evidence of a crime will be found in a particular place." *United States v. Espinoza*, 9 F.4th 633, 635 (8th Cir. 2021). "[S]o long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 232. There is universal acknowledgement among the courts that probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 236. Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id*.

There are circumstances, however, where a search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit that contained false statements, and such statements were made knowingly and intentionally or with reckless disregard for the truth. *Franks*, 438 U.S. at 155-156; *United States v. Johnson*, 75 F.4th at 841. When a defendant makes a "substantial preliminary showing" that an affiant for a search warrant made a false statement "knowingly and intentionally or with reckless disregard for the truth . . . the Fourth Amendment requires that a hearing be held at defendant's request." *Franks*, 438 U.S. at 156. But the Supreme Court has cautioned:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.
> …
>
> Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

*Franks*, 438 U.S. at 171–72.  *See also United States v. Hines*, 62 F.4th 1087, 1093 (8th Cir. 2023).

To satisfy the *Franks* test, a defendant's suppression motion must first show that the affiant himself either intentionally lied or that he recklessly misrepresented the truth in the affidavit.  *United States v. Crook*, 936 F.2d 1012, 1014 (8th Cir. 1991).  These allegations must be accompanied by an offer of proof.  *United States v. Keeper*, 977 F.2d 1238, 1242 (8th Cir. 1992).  "A showing of deliberate or reckless falsehood is not lightly met."  *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010).  Allegations of negligence or innocent mistake are not sufficient.  *Crook*, 936 F.2d at 1014.  Even if a defendant identifies portions of the affidavit that he contends and swears are false, he must offer proof of the affiant's deliberate falsehood or recklessness in including the false material in the affidavit.  *United States v. Streeter*, 907 F.2d 781, 788 (8th Cir. 1990).  Moreover, if after the contested allegations are set aside, the affidavit still contains sufficient support for probable cause, no hearing is required.  *Crook*, 936 F.2d at 1014.

In *United States v. Stevens*, the Eight Circuit reasoned that a statement is knowingly false or reckless when an affiant "in fact entertain[s] serious doubts as to the truth of the affidavit or ha[s] obvious reasons to doubt the accuracy of the information contained therein."  *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *United States v. Clapp*, 46 F.3d 795, 801 (8th Cir. 1995) (adopting the First Amendment libel standard for *Franks* inquiries)).  During a *Franks* hearing, the court may consider facts outside the four corners of the search warrant affidavit to determine the affiant's state of mind.  *United States v. Finley*, 612 F.3d 998, 1002-03 (8th Cir. 2010).

### A.    A *Franks* Hearing is Not Warranted

22

Defendant argues the affidavit included intentional or reckless false statements and omitted material information and that he is entitled to a *Franks* hearing. The Government concedes that both Lampkin and Blackwell were arrested at different times relevant to these events, and their custodial status was omitted from the affidavit. The Government also concedes that the affidavit included an error about Blackwell and Lampkin traveling to the storage units on Chippewa Street together in September 2022, which was not possible because Blackwell was in state custody.

### 1.    Omissions

Paragraph 19 of the affidavit states:

> BLACKWELL explained that he had travelled with LAMPKIN on multiple occasions to Kohl's stores in various states and, on these occasions, he personally observed LAMPKIN execute the scheme described above and/or personally assisted LAMPKIN with executing the scheme described above, either by completing the in-store return of merchandise or by completing the fraudulent online purchase of merchandise.

*Id.*

Paragraph 22 of the affidavit states:

> During the original interview, BLACKWELL explained that LAMPKIN was storing most, if not all, of the merchandise that LAMPKIN fraudulently obtained through the online purchases in storage units at EZ Storage located on Chippewa Street in St. Louis, Missouri. BLACKWELL further explained that, among other occasions, he personally accompanied LAMPKIN to the storage units in September 2022 (shortly before his arrest) and observed the merchandise from the online orders in the storage units. During the subsequent interview, BLACKWELL also explained that the merchandise was being stored unopened in its original packaging.

*Id.*

The parties do not appear to dispute that Blackwell made these statements, but Lampkin asserts SA Malik's affidavit omitted, with the purpose to mislead, that Blackwell was in custody during

the entire alleged scheme and that Lampkin was in state custody on an unrelated matter in September 2022.

A defendant seeking a *Franks* hearing based on omitted information must make "a substantial preliminary showing that (1) the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead, and (2) the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Riaski*, 91 F.4th 933, 936 (8th Cir. 2024) (quoting *United States v. Gater*, 868 F.3d 657, 659–60 (8th Cir. 2017)).  Lampkin has failed to make his showing.

As to the first prong, Lampkin argues that Blackwell's arrest and custodial status from May 15, 2021, to April 15, 2022, and Lampkin's arrest and custodial status from August 17, 2022, to November 18, 2022, are material omissions that misled the issuing judge.  He does not articulate whether he believes the omissions were intentional or made with reckless disregard for the fact that the omissions would mislead.  Lampkin's focus appears to be on the second prong of the test in *Riaski* that these omissions together rendered the probable cause to be "stale" because Blackwell was an unreliable source of information.

There is no evidence that SA Malik omitted facts with the intent to mislead the Magistrate Judge.[7]  "An officer who does not personally know information cannot intentionally

---

[7] Lampkin further argued at the second hearing that "Kohl's also has in the affidavit that Blackwell wasn't in any Kohl's until May of '22 when the alleged scheme is over with." Transcript of Hearing [ECF No. 75 at 9].  This argument is misplaced.  The summary of the Kohl's investigation in the affidavit does not state what Lampkin argues.  The information from Kohl's reflects only that Blackwell accompanied Lampkin to three stores in two states "when he personally observed LAMPKIN *unsuccessfully* attempt to execute the scheme …" on May 3, 11, and 12 of 2022.  Gov't Exh. 1 at ¶ 30 (emphasis added).  As such, this is not a separate basis for Lampkin to claim intent or negligence on the part of SA Malik in drafting the affidavit.

or recklessly omit it." *Riaski*, 91 F.4th at 936 (quoting *Hartman v. Bowles*, 39 F.4th 544, 546 (8th Cir. 2022)) (alteration omitted) (quoting *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021)); *see United States v. Bausby*, 720 F.3d 652, 657–58 (8th Cir. 2013) (holding that the omission of information not known to the affiant did not give rise to a *Franks* violation).  The affidavit attests to what Blackwell told SA Malik and Lampkin has not countered the affidavit with other evidence to show intent on SA Malik's part to mislead the Magistrate Judge.

The more salient question here is whether SA Malik omitted the facts about their custodial status recklessly, and if accurately included such facts would have undermined Blackwell's credibility to the issuing judge.  Given that SA Malik's initial interview of Blackwell occurred while he was in MDOC custody in August 2023, it was at least possible that Blackwell had other criminal history.  The affidavit does not state that SA Malik ran Blackwell's criminal history.  His background information is limited to a discussion of his custody in MDOC custody for unrelated criminal activity and a photograph of Blackwell's offender photograph from the MDOC website.  Gov't Exh. 1 at 5-6.  Confirming Blackwell's entire criminal history might have been appropriate, and such steps might have avoided the present issue.  But allegations of negligence or innocent mistake are not sufficient to trigger a *Franks* hearing. *Crook*, 936 F.2d at 1014.

Lampkin points out correctly that Blackwell's purported eyewitness account of his alleged role in the offense was a factor in establishing probable cause for the search warrant that fraud occurred, and evidence of the crimes might be found in the storage units.  Lampkin is also correct that Blackwell's reliability is questionable because he could not have participated in the scheme at any time based on the dates in the indictment because Blackwell was in custody, or because Lampkin was in custody thereafter.  But there is no evidence that SA Malik knew about

these matters at the time he presented the affidavit to the Magistrate Judge on October 4, 2023.

As a result, the Government conceded that the undersigned should strike and not consider the

entirety of Paragraph 19 and the second sentence of Paragraph 22. As modified it reads:

> During the original interview, BLACKWELL explained that LAMPKIN was
> storing most, if not all, of the merchandise that LAMPKIN fraudulently
> obtained through the online purchases in storage units at EZ Storage located on
> Chippewa Street in St. Louis, Missouri. ~~[BLACKWELL further explained
> that, among other occasions, he personally accompanied LAMPKIN to the
> storage units in September 2022 (shortly before his arrest) and observed the
> merchandise from the online orders in the storage units.]~~ During the
> subsequent interview, BLACKWELL also explained that the merchandise was
> being stored unopened in its original packaging.

*Id.* Given these concessions and the lack of another basis for further inquiry, Lampkin's request

for a further *Franks* hearing should be denied. *United States v. Lucca*, 377 F.3d 927, 932 (8th

Cir. 2004) (holding that when an informant whose information is recounted in an affidavit that is

"at least partially corroborated, attacks upon credibility and reliability are not crucial to the

finding of probable cause.") (citing *United States v. Humphreys*, 982 F.2d 254, 258–59 (8th Cir.

1992).

Regarding the current probable cause determination with these modifications, the record

is sufficient that SA Malik pursued other avenues of investigation that led to the results of Kohl's

internal investigation, Lampkin's social media posts, and the storage facility's records of

Lampkin's comings and goings for the Magistrate Judge to issue as probable cause for the search

warrant. Lampkin and Blackwell did travel together to multiple Kohl's stores in various states

during times relevant to the investigation, which was corroborated by the in-store surveillance

identifying the two men as suspects. SA Malik had a reasonable basis for relying on Blackwell's

report of Lampkin's motive for the scheme and attachment to the merchandise in the totality of

the circumstances because that insight was corroborated by the frequency of his visits to the units in 2023 and his Facebook ecommerce postings in February 2022.

Finally, Lampkin has not shown that the Kohl's investigation was unreliable or that the storage facility employees had a bias. *See United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (emphasis added) ("Because a warrant application need only show facts establishing probable cause, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause.") (internal alterations and quotations omitted).  Lampkin has not established that SA Malik omitted Defendant's custodial status in September of 2022 with the intent to mislead the issuing judge, or omitted the fact in reckless disregard of the fact that the omissions would mislead.  Ultimately, even without Blackwell's timeline, the other sources of information were internally consistent and corroborative.  They established sufficient probable cause together as to the likelihood that evidence would be found in the storage units.  Thus, Lampkin has not satisfied the second prong that these omissions were critical, and these points should be denied.

### 2.     Deliberate Falsehoods or Reckless Misstatements

As discussed above, Paragraph 22 of the affidavit states Blackwell said "that, among other occasions, [Blackwell] personally accompanied Lampkin to the storage units in September 2022 (shortly before [Blackwell's] arrest) and observed merchandise from the online orders in the storage units." [8]  *Id.*  Blackwell did make this statement to investigators; however, the affidavit did not discuss that Lampkin was arrested in Saint Louis on August 17, 2022, and he

---

[8] Defendant's other claims there is misleading information in the affidavit are addressed below.

remained in state custody without a bond until November 18, 2022.  It would not be possible for Lampkin and Blackwell to have visited the storage units together in September 2022.[9]

As discussed above, SA Malik relied on multiple sources of information and corroboration in crafting and drafting his affidavit.  Thus, Defendant has not established that SA Malik "in fact entertained serious doubts as to the truth of the affidavit or had obvious reasons to doubt the accuracy of the information contained therein."  *Stevens*, 530 F.3d 714 at 718.  The impact of the error here does not rise to a deliberate falsehood or recklessness disregard for the truth under *Franks*.  *United States v. Blair*, 93 F.4th 1080, 1085 (8th Cir. 2024), *reh'g denied*, No. 22-3573, 2024 WL 1611475 (8th Cir. Apr. 15, 2024), *and cert. denied*, 145 S. Ct. 401 (2024) (upholding denial of request for *Franks* hearing where defendant argued that affidavit falsely attributed to a confidential source that the defendant occupied an apartment and there was no link to the apartment without the false statement but where affidavit also stated defendant maintained utilities in his name and drove a car registered to the same apartment).  To the extent that Lampkin argues SA Malik recklessly disregarded the truth because he did not verify Blackwell's location or his possible custodial status, the undersigned finds this was at most negligence.  There is no evidence that SA Malik knew Blackwell's actual location.  SA Malik had corroborating evidence that Blackwell did associate with Lampkin, and that they did visit Kohl's stores together in multiple states after Kohl's cut off Lampkin's online access to Kohl's Cash, according to information gathered by Kampschroer.  Blackwell's statements also helped

---

[9] Lampkin further argues these statements should not be considered because they are hearsay. "Probable cause may be found in hearsay statements from reliable persons, in hearsay statements from confidential informants corroborated by independent investigation, or in observations made by trained law enforcement officers."  *Walden v. Carmack,* 156 F.3d 861, 870 (8th Cir. 1998). While Lampkin is correct that Blackwell's statements are not wholly reliable as to the timeline of events, SA Malik obtained corroboration for Blackwell's statements about the overall scheme. As such, Lampkin's hearsay argument is unavailing.

investigators locate the storage units, and the storage facility's employees provided additional factual support for the probable cause for a search warrant.

Finally, Defendant's claims that there is other misleading information in the affidavit are not well founded. Specifically, he argues that Paragraph 30 of the affidavit includes screenshots, labeled "Suspect(s) Information," depicting Lampkin in three Kohl's stores with Blackwell on three dates in May 2022. Lampkin argues that inclusion of these screenshots misled the issuing judge that Blackwell made personal observations about the fraud *after* Kohl's disabled Lampkin's online account in March 2022 and he could no longer conduct the scheme. In Paragraph 26, SA Malik explained that Kampschroer knew Kohl's deactivated Lampkin's access to Blue Kohl's Cash in his online shopping account by March 2022. Paragraph 30 states that the rationale for including the screenshots was to corroborate Blackwell's observations and to show the thoroughness of the separate Kohl's investigation: "The photographs pasted below corroborate BLACKWELL'S statement that he accompanied LAMPKIN on multiple occasions to Kohl's stores in various states when he personally observed LAMPKIN *unsuccessfully* attempt to execute the scheme described above…" *Id.* (emphasis added).

Nothing contained in these paragraphs are misleading or erroneous. This point should be denied.

### B.    The Search Warrant Is Valid

#### 1.    Probable Cause

Lampkin's challenge to the search warrant's probable cause is limited to an argument about staleness. For completeness, and because the Government conceded at the evidentiary hearing that there were two significant factual errors about Lampkin's and Blackwell's custodial

status that should be stricken from the text of the affidavit, the undersigned will address probable cause holistically.

It is well-established that when the issuing judge relies on a supporting affidavit attached to a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotations omitted); *see also United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014). Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference and the role of the reviewing court is "simply to ensure [the issuing judge] had a substantial basis" for the finding. *Gates*, 462 U.S. at 236.

Probable cause may be established in a variety of ways, including observations of trained law enforcement officers or by circumstantial evidence. *United States v. Jeanetta*, 533 F.3d 651, 654 (8th Cir. 2008). Information from a proven reliable informant is by itself sufficient to support a finding of probable cause to search. *United States v. Wright*, 145 F.3d 972, 974-75 (8th Cir. 1998). Statements by eyewitnesses are also a reliable source to establish probable cause. *United States v. Daigle*, 947 F.3d 1076, 1082 (8th Cir. 2020). When an affidavit contains statements by a confidential source, the reliability of the source is critical in deciding if there is sufficient probable cause. *See Solomon*, 432 F.3d at 827-28 (citing *Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("a known informant...can be held responsible if [his] allegations turn out to be fabricated") and *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (noting that in-person statements allow an affiant to assess an informant's veracity)); *see also United States v. McAtee*, 481 F.3d 1099, 1103 (8th Cir. 2007) (noting that statements against penal interest lend credibility to the person making the statements to police); *United States v. Robertson*, 39 F.3d

891, 893 (8th Cir. 1994) (reasoning that in-person statements allow affiant to assess informant's veracity) (quoting *Gates*, 462 U.S. at 234 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.")).

After Blackwell reported Lampkin's alleged fraud scheme, investigators confirmed the scheme via the electronic paper trail maintained by Kohl's, Lampkin's social media posts, and information from the storage facility employees.  The hearing record has also established that Blackwell has limited credibility, at least as far as his account of the timeline of events.  As such, Blackwell's statements support the probable cause only to the limited extent the affiant independently corroborated those statements.  *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019).[10]  Given the totality of the circumstances, the undersigned finds there was sufficient probable cause for the search warrant to issue without the stricken passages discussed here. Additionally, for this reason, Lampkin should not be entitled to a further hearing regarding *Franks*.

## 2.    Staleness

There is no bright-line test for determining when information is stale.  *United States v. Smith*, 21 F.4th 510, 514–15 (8th Cir. 2021).  Information supporting a warrant can become stale if it is not "sufficiently close in time to the issuance of the warrant and the subsequent search." *Petruk*, 929 F.3d at 960; *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017) (quoting

---

[10] As we have repeatedly recognized, "[w]hen an informant has provided reliable information in the past or where his tip was independently corroborated, a court may deem the informant's tip sufficiently reliable to support a probable cause determination." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006).

*United States v. Johnson*, 848 F.3d 872, 877 (8th Cir. 2017)), *cert. denied*, ⸺ U.S. ⸺, 138 S. Ct. 1441, 200 L.Ed.2d 721 (2018). "Important factors to consider in determining whether probable cause has dissipated ... include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." *United States v. Colbert*, 828 F.3d 718, 727 (8th Cir. 2016) (quotations and citations omitted).

Lampkin argued at the hearing that it would be "insane" for a person to collect merchandise valued at one million dollars and keep it in storage for 16 months if the intent was to sell the items. [ECF No. 75, Transcript of Hr'g at 10]. He also argues there would be little point in continuing to attempt the scheme after the Kohl's shipments ended in March 2022. He further claims, without support, that Blackwell was coerced into making a statement after a parole violation.

In this case, Blackwell explained that Lampkin treated the merchandise like a valued collection. Blackwell's statement on this point is corroborated in two areas of the affidavit. Lampkin displayed bulk quantities of merchandise on Facebook's e-commerce section in February 2022, and he continued to regularly visit the storage units, according to the facility employees in the summer and fall of 2023. This suggested that there was a reason to visit the units, possibly to replenish or check on the merchandise previously delivered. The facility employees confirmed that Lampkin upgraded his unit sizes on July 28, 2023, and he listed a declared value of the contents of each to be $50,000. *See also United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (approving of search warrant issued three years after one witness statements and four months as to another witness's statement). Thus, it seems unlikely that the probable cause would lessen in this case when considering the ongoing nature of the criminal activity, the larger storage units leased, and the reported value and volume of the merchandise.

Lampkin's continuing conduct also undercuts his staleness argument. The incident involving Lampkin and his mother that occurred on August 2, 2023, at a Kohl's store in Joplin, Missouri, followed a continued pattern. Store personnel recognized Lampkin and confronted him and his mother during their attempt to return approximately $1,800 worth of merchandise and purchase other merchandise with $1,800 in physical Blue Kohl's Cash. Store personnel voided the Kohl's Cash and attempted to keep the returned merchandise. Lampkin and his mother refused to leave the store until escorted out by police and after the returned merchandise was released to him. A staleness evaluation should consider "when the facts recited indicate activity of a continuous nature." *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021) (quotations omitted). *Johnson*, 848 F.3d at 876-7 (upholding search after eleven months). The passage of time was not so great here and the circumstances not so incredible that it obviated the fair probability that the evidence would be found given the ongoing nature of the fraud and Lampkin's alleged dedication to continue the scheme. For example, as the Eighth Circuit has reasoned:

> In this case there was evidence that [the defendant] was engaged in a continuing course of criminal activity, and we believe that it could fairly be inferred that he was keeping a supply of drugs and perhaps other evidence relating to his drug dealing in his home. Although it is true that neither the informant nor the detective had actual knowledge that contraband was in [the defendant's] home, absolute certainty was not necessary: a fair probability is all that is required.

*United States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000).

The probable cause for the search warrant was not stale. This point should be denied.

### 3.    *Leon* applies to this case

Despite the error and omissions about Blackwell's and Lampkin's custody, SA Malik could rely in good faith on the search warrant because Lampkin has not established that a *Franks* violation occurred. *United States v. Leon*, 468 U.S. 897, 921 (1984). The undersigned can

proceed with a good faith analysis.  *United States v. Conant*, 799 F.3d 1195, 1202 (8th Cir. 2015); *United States v. Puckett*, 466 F.3d 626, 629–30 (8th Cir. 2006).  Having found that the affidavit provides sufficient probable cause to support the warrant, there is no need to consider at great length the good-faith exception to the exclusionary rule.  Even if there are deficiencies in the affidavit that would defeat a finding of probable cause, such deficiencies are not so glaring as to undo the affiant's reliance on the warrant.

When considering the good-faith exception, a reviewing court "must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant."  *Id.* (citations omitted). The good-faith exception does not apply to certain situations:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

> (2) when the issuing judge "wholly abandoned [the] judicial role" in issuing the warrant;

> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and

> (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (quoting *Leon*, 468 U.S. at 923). There is no claim that the issuing judge abandoned the judicial role, and the other criteria are satisfied based on the discussion above.  Finally, based on the probable cause analysis above, the undersigned cannot say that the affidavit was so lacking in any indicia of probable cause that it would render the agent's reliance upon the search warrants to be unreasonable.  This point should be denied.

Accordingly,

34

**IT IS HEREBY ORDERED** that the Government's motions for clarification [ECF Nos. 67 & 81] are **DENIED AS MOOT.**

**IT IS HEREBY RECOMMENDED** that defendant's motion to suppress [ECF No. 61] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that defendant's motion to dismiss [ECF No. 63] be **DENIED AS MOOT.**

**IT IS FURTHER RECOMMENDED** that defendant's motion to dismiss [ECF No. 77] be **DENIED.**

**IT IS HEREBY ORDERED** that at the direction of United States District Judge Henry E. Autrey this matter is set for trial on **June 30, 2025,** at **9:30 am.**

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to timely file objections may result in the waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).

/s/ Noelle C. Collins
United States Magistrate Judge

Dated this 30th day of May, 2025.